IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| WILLIAM MOUNCE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:20-cv-00569 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LORETTA BURKETT, *et al.*, | ) | By: Hon. Michael F. Urbanski |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

William Mounce, a Virginia inmate proceeding pro se, is incarcerated at the Southwest Virginia Regional Jail (SWVRJ). Mounce has filed a complaint pursuant to 42 U.S.C. § 1983 alleging that defendants Loretta Burkett, Crystal Large, and Charles Hurlburt, M.D., violated his Eighth Amendment constitutional right to be free from cruel and unusual punishment. Burkett is a nurse who is the Health Services Administrator for SWVRJ's Haysi facility. Nurse Burkett coordinates medical care, and she responds to inmate grievances. Large is a nurse practitioner who provides medical services for inmates at SWVRJ facilities. Dr. Hurlburt is a physician who provides medical services for inmates at SWVRJ facilities. Each defendant has filed a motion for summary judgment. ECF Nos. 22, 28, 30. Mounce has responded to the motions, largely by handwriting comments on defendants' briefs, affidavits and supporting documents. ECF Nos. 34, 50, 54, 59.

1

Mounce filed this lawsuit on September 22, 2020,[1] claiming deliberate indifference to a serious medical need in violation of the Eighth Amendment because his prison health care providers reduced his dosage of lactulose, a drug prescribed to treat Mounce's liver condition, from July 21, 2020 to August 18. 2020. Mounce's responses frequently refer to defendant's conduct in reducing his lactulose dose as "concurrent negligence." Mounce also claims that his First Amendment rights were violated because of responses he received to grievances submitted about his lactulose dosage. At most, Mounce claims a disagreement with the medical care he received. Because Mounce's claims are not of constitutional dimension, defendants' motions for summary judgment will be **GRANTED** and the case dismissed.

## I. Background

### A. Claims against Dr. Hurlburt and NP Large

Mounce suffers from a liver condition known as hepatic encephalopathy. At all times relevant to this lawsuit, SWVRJ medical providers have prescribed lactulose for Mounce's hepatic encephalopathy. Beginning on February 11, 2020, Mounce's lactulose dosage was 90 ml three times daily ("TID"). [2]

On July 18, 2020, Mounce was transferred from the SWVRJ facility at Abingdon to the facility at Haysi. Shortly after Mounce arrived at Haysi, Mounce's lactulose dosage was lowered. Mounce alleges the lowered dosage was "60cc 2 times a day." Dr. Hurlburt avers, consistent with Mounce's medical records, that he lowered Mounce's dosage to the pre-

---

[1] Mounce's medical records, submitted with defendants' motions, continue up to November 2020. There is no indication of further issues with his lactulose dosage.

[2] Mounce began taking lactulose prior to his incarceration in August 2017. According to his medical records, Mounce's lactulose dosage immediately prior to February 11, 2020, was 45 ml BID.

February 11, 2020 level of 45 ml twice daily ("BID"). According to Mounce's medical records,, the change in dosage appears to have taken effect on or about July 21, 2020.

Dr. Hurlburt ordered the reduced lactulose dosage based on his review of Mounce's records, believing the 90 ml TID dose to be a high one and that a lower dosage would be safer. Dr. Hurlburt had noted that Mounce had been seen by a physician at Abingdon on July 14, complaining of abdominal pain. Dr. Hurlburt's plan was "to assess the effect of the lower, safer dose, with the goal that it remain therapeutic and cause fewer symptoms." Aff. of Charles Hurlburt, M.D., ECF No. 23-1, at ¶ 8. Dr. Hurlburt lowered Mounce's lactulose dosage based on his clinical training, experience, and knowledge of Mounce's condition, exercising his clinical judgment as a physician. Id. at ¶¶ 8,9. Although Dr. Hurlburt did not see Mounce in person until August 18, 2020, Dr. Hurlburt explains that he reduced the dosage based on his review of Mounce's medical records, which he conducted when Mounce was transferred from Abingdon to Haysi. Id. at ¶¶ 7,8.

Mounce disagrees with Dr. Hurlburt's clinical judgment, arguing that there was no reason to lower his lactulose dose. Mounce alleges that the reduced lactulose dosage caused him to experience paranoia, bad visions, and thoughts of harming himself and others.

On July 27, 2020, Mounce was seen by Jennifer L. Miller, R.N. According to Miller's notes of the encounter, Mounce asked for hemorrhoid cream and complained of increased irritation from hemorrhoids, and inquired about an MRI to check for a possible tear in the lining of his stomach. Mounce complained of increased abdominal pain since being placed on the reduced lactulose dosage, and also constipation and hard stools. Nothing in Miller's

notes indicates that Mounce complained of paranoia, bad visions, and thoughts of harming himself and others.

Miller relayed Mounce's complaints to NP Large. NP Large increased Mounce's lactulose dosage to 90 ml twice daily (BID). While this was an increase from the July 21 45 ml BID dosage, it was still less than the 90 ml three times daily dose Mounce had been taking prior to his transfer to Haysi. In her affidavit in support of her motion for summary judgment, NP Large describes the considerations for determining dosage levels:

> While effective at lowering ammonia levels caused by liver disease, lactulose has significant side effects and is a harsh laxative. One goal of management is to lower the ammonia level sufficiently to decrease toxicity with the lowest possible dose of lactulose. Ammonia levels are monitored and lactulose dosage is frequently adjusted in response to laboratory values, patient symptoms, and side effects. Because ammonia levels fluctuate, identifying the appropriate dose that both manages the toxicity or elevated ammonia levels and avoids unwanted side effects is a delicate balance.

Aff. of Crystal Large, NP, ECF No. 29-1, at ¶ 6. In her affidavit, NP Large agrees with Dr. Hurlburt's clinical judgment that 90 ml TID is a high dose of lactulose, and avers that she supported Dr. Hurlburt's medical decision to lower Mounce's lactulose dosage "because the reason for the change was to achieve improvement in side effects and symptoms." Id. at ¶ 9.

Mounce's blood was drawn on August 5, 2020, to check his blood ammonia levels. Mounce maintains his ammonia levels should have been checked sooner, and should have been checked before lowering his lactulose dosage.

On August 18, 2020, Dr. Hurlburt examined Mounce in person. At that visit, Mounce complained he was not getting the correct dosage of lactulose. According to his medical records, Mounce reported he was "seeing things," and complained that the lactulose dosage

4

had been lowered without getting lab results. He also complained of ear pain, that he was not able to hear in his left ear, and he had hemorrhoid-related complaints.

At the August 18, 2018 visit, Dr. Hurlburt restored Mounce's lactulose dosage to 90 ml TID, the level it had been prior to his transfer to Haysi. Mounce's lactulose dosage remained at 90 ml TID as of the date Dr. Hurlburt executed his affidavit, November 24, 2020. Dr. Hurlburt maintains that:

> The temporary decrease in lactulose dosage between July 21, 2020, and August 18, 2020 did not alter the course of Mr. Mounce's liver disease or cause any severe or permanent effects. Theoretically, if the decreased dose caused elevated ammonia levels in Mr. Mounce's blood at any point during that month, he could have experienced a temporary increase in symptoms due to the toxicity. Nevertheless, such temporary increases are often unavoidable in the treatment of hepatic encephalopathy.

Dr. Hurlburt Aff., ECF No. 23-1, at ¶ 13. NP Large agrees that the temporary decrease in Mounce's lactulose dosage did not cause any severe or permanent effects. NP Large Aff., ECF No. 29-1, at ¶ 13.

Dr. Hurlburt further maintains that he "never disregarded Mounce's medical condition or acted with deliberate indifference to any of his medical needs; nor did [he] delay or interfere with [Mounce's] treatment." Dr. Hurlburt Aff., ECF No. 23-1, at ¶ 14. Dr. Hurlburt avers that he attempted to manage Mounce's hepatic encephalopathy "at the safest, most effective dose of lactulose possible." Id.

Between July 21 and August 14, 2020, Mounce initiated several grievances relating to his lactulose dosage, which he attached to his complaint. Mounce has submitted numerous other grievance-related documents in his responses to defendants' motions for summary judgment. However, as defendants' motions are not based on any alleged failure to exhaust

5

administrative remedies, Mounce's grievance records will not be addressed by the court, except to the extent that Mounce's comments on his grievance documents relate directly to his claims of constitutionally inadequate medical care, and his claim of alleged violation of his First Amendment rights.

Mounce has responded to defendants' motions with hundreds of pages of documents, including copies of defendants' briefs and exhibits, with many pages bearing Mounce's comments written and interlineated on them. Many of Mounce's comments are repetitive, and reiterate the allegations he has made in his complaint. The documents submitted by Mounce do not contradict the medical records submitted by defendants. In sum, Mounce's responses to defendants' summary judgment motions and affidavits consist of the following:

(1) Mounce maintains his lactulose dosage should not have been changed. He complained about the change from the outset, and he continued complaining, including complaints that he was "seeing things" on the lowered dosage. He maintains the lowered dosage put his life in danger.

(2) Mounce argues that the fact the doctor returned his dosage to its previous level is an implicit admission that the higher dosage was needed.

(3) Mounce argues that his blood ammonia level should have been checked sooner, and should have been checked before his lactulose dosage was lowered. Mounce's ammonia levels were checked on August 5, 2020, and were found to be elevated.

(4) Mounce repeatedly inserts the phrase "concurrent negligence" in his responsive comments, which the court interprets to reference his treatment by both NP Large and Dr. Hurlburt.

B.    **Claims against Nurse Burkett**

To the extent Mounce has alleged that his First Amendment rights were violated for putting in grievances, this claim would appear to be aimed against Nurse Burkett. Nurse Burkett, as Health Services Administrator, never provided any medical care to Mounce, had no personal interactions with him, and was not involved in any treatment decisions. Nurse Burkett reviewed Mounce's medical records. Nurse Burkett responded to several of Mounce's grievances regarding his lactulose dosage, often by "pointing out that his complaints had been, or would soon be addressed by medical staff." ECF No. 31-1, p.3, ¶ 9. Nurse Burkett appends 51 pages of Mounce's grievance records to her affidavit.

Mounce submits documentation that he lodged numerous grievances regarding his lactulose dosage, as well as other medical issues, between July and October 2020. Mounce's documents do not contradict the grievance records submitted by Nurse Burkett.

In Mounce's words, his claim against Nurse Burkett consists of the following:

> Ms. Nurse Burkett states she reviews and responds to inmate grievances. Page 3 of 9. She knows about me seeing things, bad thoughts of hurting self and other symptoms. She states on page 2 of 3 page [paragraph?] 5 she is familiar with Mr. Mounce's situation and has reviewed the Medical Records and Grievances. See paperwork.
> Concurrent negligence
> Cruel and unusual punishment
> Freedom of speech

ECF No. 50, p.1.

## II.  Legal Standards

A.    **Motion for Summary Judgment**

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

7

56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 24-48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 930 (4th Cir. 1990) (quoting Anderson, 377 U.S. at 249-40). The court must determine whether the evidence "'presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (citing and quoting Anderson, 477 U.S. at 255, 251-52) (internal quotation marks omitted).

**B.     Liability under § 1983**

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish that he has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States and that the conduct about which he complains was committed by a person acting under color of state law. Dowe v. Total Action Against Poverty

in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998); see also Conner v. Donnelly, 42 F.3d 220, 223 (4th Cir. 1995). "Liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights. The doctrine of respondeat superior has no application under [§ 1983]." Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Bennett v. Gravelle, 323 F. Supp. 203, 214 (D. Md. 1971)); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

### C. Eighth Amendment Deliberate Indifference – Medical Care

"[T]he State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated." West v. Atkins, 487 U.S. 42, 54 (1988). In order to state an Eighth Amendment claim based on the denial of medical care, a plaintiff must demonstrate that the defendants' actions (or failure to act) amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). This requires a showing of two elements. First, the plaintiff must provide evidence showing that he suffered from an objectively serious medical need. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A serious medical need may also be shown by a condition that, "absent treatment, could result in further significant injury or the unnecessary and wanton infliction of pain; [] a reasonable doctor or patient would find important and worthy of comment or treatment; [] significantly (and adversely) affect[s] each of the Plaintiffs' daily activities; or [] involve[s] the existence of chronic and substantial pain." Scott v. Clarke, 64 F. Supp. 3d 813, 822 (W.D. Va. 2014) (citations omitted); see also Hudson

v. McMillian, 503 U.S. 1, 9 (1992) (explaining that the requirement that a particular medical must be "serious" stems from the fact that "society does not expect that prisoners will have unqualified access to health care").

Second, to show deliberate indifference, the plaintiff must show that the defendants were subjectively aware of the need for medical attention, but failed either to provide it or to ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Instead, the defendants' disregard for a plaintiff's medical condition must have been "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013). "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. A medical provider is not deliberately indifferent simply because the provider chooses to treat an ailment by means other than the prisoner's preferred method. Hixson v. Moran, 1 F.4th 297, 302–03 (4th Cir. 2021); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).[3]

---

[3] Although Mounce's complaint mentions the Fourteenth as well as the Eighth Amendment, he has no stand-alone Fourteenth Amendment substantive due process claim. "Typically, substantive due process rights are invoked by pre-trial detainees and other nonincarcerated persons seeking medical care who cannot invoke the Eighth Amendment." Cooleen v. Lamanna, 248 Fed. App'x. 357, 361 (3d Cir. 2006). As a Virginia inmate, Mounce's medical care claim falls squarely within the ambit of the Eighth Amendment. The Supreme Court has made clear that "[i]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process [under the Fourteenth Amendment]." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)). It is well-established that "deliberate indifference to an inmate's medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (citing Estelle, 429 U.S. at 104). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." Estelle, 429 U.S. at 104 [footnotes omitted]. Thus, if a plaintiff "can properly invoke the Eighth Amendment to challenge issues

**D.     First Amendment - Retaliation**

To prove a First Amendment retaliation claim, a prisoner must show that: (1) he engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between the prisoner's protected activity and the defendant's actions. Martin v. Duffy, 977 F.3d 294, 298-99 (4th Cir. 2020). There is "a burden-shifting framework to evaluate causation in First Amendment retaliation claims, originally articulated in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977)." Id. at 299. The Fourth Circuit applies Mt. Healthy's burden-shifting framework to prisoner claims of retaliation. Id. at 304, 306. Under this framework, after a prisoner establishes a prima facie case of retaliation, the defendant must show that it would have taken the same actions in the absence of the protected conduct. Id. at 299. Courts have some flexibility in evaluating the parties' competing explanations of causation. Id. at 304.

**III.  Discussion**

**A.     Analysis of Claims against Dr. Hurlburt and NP Large**

The core of Mounce's claims against Dr. Hurlburt and NP Large is that his lactulose dosage should never have been decreased from the 90 ml TID amount established as of February 11, 2020, that his blood ammonia level should have been checked before any change was made, that his complaints about the lowered dosage were not timely addressed thereby

---

relating to his medical care," then "[t]he very viability of his Eighth Amendment claims means that his substantive due process claims are without merit[.]" Cooleen v. Lamanna, 248 Fed. App'x. at 362.

putting his life in danger. Mounce asserts that Dr. Hurlburt and NP Large misrepresent who was responsible for what actions, and when events occurred.

Mounce, however, does not present a genuine issue as to Hurlbert's and NP Large's professional concerns regarding the possible side-effects and damage that might result from too high a dosage of lactulose. Dr. Hurlburt and NP Large both aver that 90 ml TID is a high dose of lactulose, and that a lower dosage would be safer.

Mounce has produced no evidence that Dr. Hurlburt or NP Large were acting with deliberate indifference when they sought to assess whether a lower dosage of lactulose would be sufficiently effective for Mounce. The relevant, material facts are clearly established by Mounce's medical records, including the medical records that Mounce himself has repeatedly submitted. NP Large acted promptly in response to Mounce's complaints, to increase the lactulose dosage to a level of 90 ml BID, within a week after Dr. Hurlburt lowered the dosage to 45 ml BID. Mounce's blood ammonia level was checked on August 5, about two weeks into the effort to determine whether a lowered dosage would be adequate. Mounce's blood ammonia levels were found to be elevated. Dr. Hurlburt further increased Mounce's lactulose dosage to 90 ml TID on August 18.

There are countervailing considerations as to Mounce's medical needs in this context. Both Dr. Hurlburt and NP Large acknowledge that Mounce had a need for a sufficiently therapeutic dosage of lactulose. Equally, for his own safety, Mounce needed to have the lowest effective dosage of lactulose. Dr. Hurlburt explains that temporary increases in ammonia toxicity may result when a physician is attempting to determine appropriate lactulose dosage, that such temporary effects are unavoidable in the treatment of hepatic encephalopathy, and

that there are no severe or permanent effects. Dr. Hurlburt Aff., at ¶¶ 6,13. NP Large avers that managing lactulose dosage, against toxicity levels, while avoiding unwanted side effects, is a delicate balance. NP Large Aff., at ¶ 6. Mounce has not produced any evidence that credibly counters these considerations.

Mounce also fails to present a genuine issue of material fact as to the method and manner chosen by Dr. Hurlburt and NP Large to test whether Mounce could obtain therapeutic effects from a lowered lactulose dosage. Mounce argues that his blood ammonia level should have been checked before the dosage was lowered. It is within the experience of reasonable jurors that medical providers may adjust medication levels from time to time, and that the medical providers may use a patient's reaction to such adjustments as an indication of whether the adjustment has succeeded, or whether further adjustments should be made. Dr. Hurlburt's decision as to when to check Mounce's blood ammonia is a professional determination within Dr. Hurlburt's purview as a treating physician. See Hixson, 1 F.4th at 302-03. Mounce's disagreement with Dr. Hurlburt's choice of course of treatment will not support a valid Eighth Amendment claim. Id.; see also Jackson v. Sampson, 536 Fed. App's 356, 357 (4th Cir. 2013).

There is an issue of fact as to whether Mounce told Dr. Hurlburt, at their visit on August 18, 2020, that Mounce was having hallucinations ("seeing things"). Dr. Hurlburt appears to aver this did not occur, but Mounce's medical records appear to support Mounce's position that he did convey this information to Dr. Hurlburt. The factual dispute, however, is immaterial, because Dr. Hurlburt returned Mounce to the higher lactulose dosage as of the date of that visit. It also appears that Mounce was simultaneously undergoing a change in the

13

dosage of his psychotropic medication, and that his may have caused ongoing issues with hallucinations, even after the lactulose dosage was returned to 90 ml TID.

Mounce's lactulose dosage was returned to its previous level less than a month after Dr. Hurlburt attempted to reduce it. According to the evidentiary record, this followed on clinical evaluation of Mounce's response to the lowered dosage. There is no indication in Mounce's medical records that he experienced further issues after the lactulose dosage was returned to 90 ml TID. Mounce apparently did continue to experience hallucinations, which he attributed to an unrelated, lowered dosage of another medication: the psychotropic medication Seroquel. As such, there is no genuine dispute as to any material fact which would support a verdict in Mounce's favor as to his Eighth Amendment deliberate indifference claims against Dr. Hurlburt and NP Large. These two health care professionals temporarily reduced Mounce's dose of lactulose to balance its therapeutic benefit in treating hepatic encephalopathy against the significant side effects of this medication Within a month, these health care professionals increased his dose of lactulose, and Mounce's complaints abated. On this record, there is no basis whatsoever for an Eighth Amendment deliberate indifference claim.

As to Mounce's First Amendment claim, there is no evidence that either Dr. Hurlburt and NP Large played any role in responding to kiosk requests or grievances. Nothing in this record suggests that Dr. Hurlburt or Mounce retaliated against Mounce or otherwise violated Mounce's First Amendment rights.

**B.     Analysis of Claims against Nurse Burkett**

To the extent Mounce is alleging any Eighth Amendment claim against Nurse Burkett, the claim must fail because Mounce has not produced any evidence that Nurse Burkett was involved in any of the lactulose treatment decisions. Mounce equally fails to demonstrate any genuine issue of any material fact regarding a First Amendment retaliation claim against Nurse Burkett.

Mounce's extensive kiosk and grievance records, submitted by both Nurse Burkett and by Mounce himself, provide no credible support that Nurse Burkett retaliated against Mounce for any complaint, grievance, or any other protected activity. Mounce's frequent inquiries and grievances were answered promptly. There is no indication that Mounce was ever prohibited from pursuing his concerns, or was otherwise retaliated against by Nurse Burkett, or that he was ever threatened in any manner.

**C.      The Court Will Decline to Exercise Jurisdiction over Mounce's State Law Claims**

To the extent that any of Mounce's claims can be interpreted as state law tort claims, the court declines to exercise jurisdiction over them in light of the dismissal of his federal claims. See 28 U.S.C. § 1367(c)(3).[4]

**IV. Conclusion**

For the foregoing reasons, the court: (1) **GRANTS** defendant Dr. Hurlburt's motion for summary judgment, ECF No. 22; (2) **GRANTS** defendant NP Large's motion for

---

[4] It is possible that any common law negligence claim against one or more of the defendants, if a government employee, would be barred by sovereign immunity under the test set for the in James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980). In particular, decisions about the amount of medicine to prescribe and dispense generally involve the use of judgment and discretion. Whitley v. Commonwealth, 260 Va. 482, 494, 538 S.E.2d 296, 302 (2000). But defendants apparently did not construe Mounce's complaint s including any negligence claims, and they have not argued or briefed that issue. Accordingly, the court does not address the possibility of sovereign immunity as to any negligence claim and instead dismisses without prejudice all state law claims.

summary judgment, ECF No. 28; and (3) **GRANTS** defendant Nurse Burkett's motion for summary judgment, ECF No. 30. The case will be **DISMISSED** and stricken from the docket.

An appropriate order will be entered.

Entered: September 14, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.09.14 16:08:58
-04'00'

Michael F. Urbanski
Chief United States District Judge